Roderick N. SALFINGER and
Threshold Aeronautics, LLC,
Plaintiffs-Appellants,

v.

FAIRFAX MEDIA LIMITED, d/b/a Sydney Morning
Herald, Fairfax Media Publications
Party Limited and Fairfax Digital Australia
and New Zealand Party Limited,
Defendants-Respondents,

Ken HARDY, d/b/a Mafia Today, MinzEye Limited,
Enom, Inc., Stuart Pigott Global Reisling,
GMBH, Howell Brendan and John/Jane Does,
Defendants.

Court of Appeals

*No. 2015AP150. Oral argument December 15, 2015.
—Decided January 20, 2016.*

2016 WI App 17

(Also reported in 876 N.W.2d 160.)

316

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Franklyn M. Gimbel* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin & Brown, LLP*, Milwaukee. There was oral argument by *Franklyn M. Gimbel.*

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert J. Dreps* and *Dustin B. Brown* of *Godfrey & Kahn, S.C.*, Madison. There was oral argument by *Dustin B. Brown.*

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Roderick N. Salfinger and Threshold Aeronautics, LLC (we refer to Roderick Salfinger individually as "Mr. Salfinger" and to the co-appellants collectively as "Salfinger") appeal from a final order dismissing Fairfax Media Limited, d/b/a the *Sydney Morning Herald*, Fairfax Media Publications Party Limited, and Fairfax Digital Australia and New Zealand Party Limited (collectively, "the Fairfax parties") for lack of jurisdiction.[1] On appeal, Salfinger asserts that the trial court erred in finding that, although jurisdiction was authorized under WIS. STAT. § 801.05(4)(b) (2013–14),[2] exercising that jurisdiction would offend due process. We agree with the trial court and affirm.

## BACKGROUND

¶ 2. This lawsuit, which challenges Wisconsin jurisdiction over multiple Australian and New Zealand defendants, has its genesis in an article entitled "Lawyers, guns, money: the sting in Yellow Tail" published in the *Sydney Morning Herald* on October 30, 2010. That article, which circulated in print within Australia, was also made available worldwide on the internet

---

[1] The order appealed from also dismissed defendants Ken Hardy d/b/a Mafia Today, Minzeye Limited, Enom, Inc., Stuart Pigott Global Reisling, GMBH, Howell Brendan, and John/Jane Does (collectively, the "non-Fairfax parties") for lack of service. On appeal, Salfinger argues only that the trial court erred in finding that there was no jurisdiction over the Fairfax parties and raises no argument as to the dismissal of the non-Fairfax parties. Accordingly, we do not discuss the trial court's dismissal of the non-Fairfax parties.

[2] All references to the Wisconsin statutes are to the 2013–14 version unless otherwise noted.

via the *Sydney Morning Herald*'s website.[3] While it is not entirely clear how many individuals in Wisconsin have actually accessed or read that article since first appearing online, 826,746 users located in Wisconsin accessed the *Sydney Morning Herald* website between May 23, 2011, and June 16, 2014.[4]

¶ 3.   The *Sydney Morning Herald* article at issue in Salfinger's lawsuit primarily discussed the Australian family behind the popular Yellow Tail wine label; however, it also touched on the family's relationship with appellant Roderick Salfinger. Numerous individuals offered descriptions and opinions about Mr. Salfinger in the article that were less than flattering, and Salfinger's lawsuit hones in on one specific statement that Salfinger alleges is untrue and defamatory and has caused personal and professional harm:   that Mr. Salfinger "faces prosecution in the [United States] after allegedly producing a revolver at his daughter's wedding." Mr. Salfinger denies that he engaged in such conduct and requested that the *Sydney Morning Herald* retract the statement, which it has, to date, refused to do.

¶ 4.   Mr. Salfinger, an Australian citizen, asserts that he has resided in Shorewood, Wisconsin, since August 2010.[5] He claims that the alleged harm

---

[3] The *Sydney Morning Herald*'s website is http://www.smh.com.au. The article was first published by Fairfax Media Publications Party Limited on the website on October 29, 2010.

[4] Salfinger identifies a "user" as an IP address from a computer or mobile device. "User," as used herein, does not necessarily represent a single person.

[5] There is some discussion in the parties' briefs as to Mr. Salfinger's citizenship and residence. Regardless of his citizenship, Mr. Salfinger asserts that he is and has been a Wisconsin resident since August 2010, and it does not appear that Fairfax

319

suffered—both business and personal—stems from the *Sydney Morning Herald* publication and that the alleged injury occurred in Wisconsin because of his residence here. Among the alleged harms Mr. Salfinger claims to have suffered include: (1) loss of investments in co-appellant Threshold Aeronautics, LLC, by potential investors; (2) loss of business opportunities in the mining industry; (3) inability to establish or maintain meaningful interpersonal relationships; and (4) depression.

¶ 5. At least some of Mr. Salfinger's alleged business harm relates to his membership interest in co-appellant Threshold Aeronautics, LLC ("Threshold"), a domestic limited liability company registered in Wisconsin as of June 14, 2012—nearly two years after the *Sydney Morning Herald* article at issue was published. Generally speaking, the alleged harm to Threshold arises from Mr. Salfinger's status as one of its two members, as Salfinger alleges that Threshold has lost out on investments due to the unwillingness of investors and businesses to work with Threshold and Mr. Salfinger after reading about Mr. Salfinger in the *Sydney Morning Herald* article. The *Sydney Morning Herald* article makes no reference to Threshold.

¶ 6. Respondent Fairfax Media Limited is a media holding company incorporated in New South Wales, Australia, with its principal offices located in Pyrmont, Australia.[6] Respondent Fairfax Media Publications

_____

has set forth any evidence refuting Mr. Salfinger's assertion that he was residing in Shorewood, Wisconsin, on the date that the article was published. Shorewood is located along Lake Michigan just north of Milwaukee.

[6] The complaint identifies Fairfax Media Limited as "Fairfax Media Limited, d/b/a the Sydney Morning Herald." In its answer, Fairfax Media Limited denies that it does business as the *Sydney Morning Herald*.

Party Limited is a media publisher and is also incorporated in New South Wales, Australia, with its principal offices located in Pyrmont, Australia. In its answer, Fairfax Media Publications Party Limited affirmatively alleges that it publishes the *Sydney Morning Herald.* Respondent Fairfax Digital Australia and New Zealand Party Limited, too, is a media publisher incorporated in New South Wales, Australia, and its principal offices are also located in Pyrmont, Australia.

¶ 7. Salfinger filed the summons and complaint on October 30, 2013, and the Fairfax parties were served on January 28, 2014.[7] The Fairfax parties filed an answer and affirmative defenses on March 18, 2014, raising lack of personal jurisdiction as an affirmative defense. The trial court stayed all discovery except discovery dealing with jurisdiction, and on July 29, 2014, the Fairfax parties filed a motion to dismiss for lack of personal jurisdiction.[8]

¶ 8. The parties engaged in significant briefing on the Fairfax parties' motion to dismiss. The trial court had initially planned to issue its decision on the motion to dismiss at a hearing on October 22, 2014; however, on October 21, 2014, Salfinger moved to amend the complaint and to stay the pending motion to dismiss, arguing that he would concede claims against certain defendants and would also clarify the factual basis for the remaining jurisdiction claims if allowed to

---

[7] Salfinger filed the summons and complaint *pro se* and later retained counsel. He was represented by counsel throughout the briefing on the motion to dismiss and on appeal.

[8] That motion also included an alternative argument that the Fairfax parties were entitled to partial judgment on the pleadings. The trial court did not address the alternative argument, however, having concluded that dismissal was warranted. The Fairfax parties' alternate argument is not at issue on appeal.

file the amended complaint. Salfinger further suggested that allowing him to submit an amended complaint would aid the trial court in deciding whether there was jurisdiction over the Fairfax parties.

¶ 9. The trial court, despite recognizing that Salfinger's motion "arrive[d] at the last minute after a motion to dismiss [was] fully briefed," nevertheless allowed Salfinger to file a proposed amended complaint. However, it denied Salfinger's request to stay the motion to dismiss and informed the Fairfax parties that they were not required to file responsive pleadings until after the trial court issued its ruling on the motion to dismiss. The trial court allowed Salfinger to file a supplemental response to the motion to dismiss "asserting any ground in opposition to the motion that ha[d] not previously been asserted," and the Fairfax parties were also given an opportunity to respond to Salfinger's supplemental brief.

¶ 10. The trial court thereafter issued its written decision and order on December 8, 2014, granting the Fairfax parties' motion to dismiss for lack of personal jurisdiction. In its written decision, the trial court explained that although it found that Wis. Stat. § 801.05(4)(b) applies and allows for jurisdiction, it nevertheless concluded that the Fairfax parties' "contacts with Wisconsin are simply too insubstantial to satisfy the dictates of the due process clause."

¶ 11. On appeal, we do not address the underlying nature of Salfinger's lawsuit. Rather, this matter comes to us for resolution of a jurisdictional issue that presents the unique question of whether a Wisconsin court may exercise jurisdiction over foreign defendants whose only real connection to the State of Wisconsin is in having published an article online that is ostensibly available to anyone in the world and that also provides

for targeted advertising based upon the user's location and interests. Additional facts will be developed below.

## ANALYSIS

¶ 12.   Personal jurisdiction under the long-arm statute falls into two categories: general personal jurisdiction and specific personal jurisdiction. *Rasmussen v. General Motors Corp.*, 2011 WI 52, ¶ 15, 335 Wis. 2d 1, 803 N.W.2d 623. If there is general personal jurisdiction over a nonresident defendant, the defendant may be sued in a Wisconsin court for claims entirely unrelated to the defendant's activities in Wisconsin. *Id.* Specific jurisdiction over a nonresident defendant is more limited in that "the claim for relief for which personal jurisdiction is sought must be substantially connected to or arise out of the defendant's contacts with Wisconsin." *Id.* Salfinger contends that there is specific jurisdiction over the Fairfax parties because his defamation claim arises from an article made available online at the *Sydney Morning Herald* website, which can be accessed in Wisconsin.[9]

¶ 13.   Whether there is personal jurisdiction under Wisconsin's long-arm statute requires us to apply a two-step analysis. *See Kopke v. A. Hardtrodt S.R.L.*, 2001 WI 99, ¶ 8, 245 Wis. 2d 396, 629 N.W.2d 662. First, we must determine whether the Fairfax parties are subject to jurisdiction under Wisconsin's long-arm

[9] Salfinger does not explicitly assert whether general or specific personal jurisdiction exists over the Fairfax parties; however, Wis. Stat. § 801.05(4)(b), the only grounds upon which Salfinger asserts jurisdiction exists, is a specific personal jurisdiction statute.

statute, Wis. Stat. § 801.05(4). *Kopke*, 245 Wis. 2d 396, ¶ 8. While we benefit from the trial court's analysis, our review is *de novo*. *See Rasmussen*, 335 Wis. 2d 1, ¶ 14. The long-arm statute is to be construed liberally and in favor of jurisdiction, *id.*, ¶ 17, and the party asserting jurisdiction carries a " 'minimal burden of establishing a *prima facie* threshold showing that constitutional and statutory requirements for the assumption of personal jurisdiction are satisfied[,]' " *Kopke*, 245 Wis. 2d 396, ¶ 8 (citation omitted; emphasis added). "[W]e may consider documentary evidence and weigh affidavits in reaching a determination as to whether this burden has been met," and factual doubts at this stage are resolved in favor of the plaintiff. *Id.*

¶ 14.   If we conclude that the statutory requirements of Wis. Stat. § 801.05(4) are satisfied, we must then "consider whether the exercise of jurisdiction comports with due process requirements." *Kopke*, 245 Wis. 2d 396, ¶ 8. "The Due Process Clause of the Fourteenth Amendment limits the exercise of jurisdiction by a state over a nonconsenting nonresident." *Id.*, ¶ 22. "The limits of due process are . . . established by the rules set forth in the decisions of the United States Supreme Court." *Id.*

¶ 15.   We begin by considering whether Wis. Stat. § 801.05(4) authorizes the exercise of jurisdiction over the Fairfax parties in a Wisconsin court.

I.   *Wisconsin Stat. § 801.05(4)(b) authorizes the exercise of jurisdiction over the Fairfax parties.*

¶ 16.   The parties do not actually dispute on appeal that Wis. Stat. § 801.05(4)(b) authorizes jurisdic-

tion in this matter.[10] In fact, the Fairfax parties' response brief addresses only the due process prong of the analysis in light of the trial court's dismissal on due process grounds. Because our review of the trial court's decision is *de novo,* we briefly discuss our agreement with the trial court's conclusion that § 801.05(4)(b) authorizes jurisdiction in this case.

¶ 17. WISCONSIN STAT. § 801.05 provides grounds under which Wisconsin courts are authorized to exercise personal jurisdiction. Section 801.05(4)(b), as pertinent to this case, provides:

> (4) LOCAL INJURY; FOREIGN ACT. In any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury, either:
>
> . . . .
>
> (b) Products, materials or things processed, serviced or manufactured by the defendant were used or consumed within this state in the ordinary course of trade.

Salfinger claims a local injury arose out of a foreign act because he resided in Wisconsin at the time the allegedly defamatory statement was published and because the alleged act—the publication of the *Sydney Morning Herald* article—occurred in Australia. Salfinger further argues that the Fairfax parties processed, and

---

[10] We note that in their brief, the Fairfax parties question Salfinger's claim of Wisconsin residency. However, as the Fairfax parties correctly acknowledge, factual disputes at this stage are resolved in Salfinger's favor, *see Kopke v. A. Hartrodt S.R.L.,* 2001 WI 99, ¶ 8, 245 Wis. 2d 396, 629 N.W.2d 662, and therefore, for the purposes of our analysis, we assume that Salfinger was a resident at the time the alleged injury occurred as he alleges.

continue to process, the allegedly defamatory article and that Wisconsin residents have consumed that article in the ordinary course of trade. Accordingly, whether jurisdiction is authorized under § 801.05(4)(b) in this case turns on the meaning of the word "processed" as used in that statute.[11]

¶ 18. Salfinger's brief raises two related arguments pertaining to the word "processed" as used in WIS. STAT. § 801.05(4)(b). First, Salfinger argues that the Fairfax parties' action of converting the written publication of the article to its online format was an act of processing so that the product—content posted on the *Sydney Morning Herald*'s website—could be consumed by a user with internet access anywhere in the world. Relatedly, Salfinger suggests that the targeted online advertising that appears on the *Sydney Morning Herald* website is also a form of processing, as the advertisements re-populate each time a user accesses the website. The advertisements are therefore ever-changing based upon the user's geographic location, interests as documented by the computer's tracking "cookies," or any number of algorithms.[12] Accordingly, Salfinger argues, "processing" actually occurs each time a user accesses the website.

¶ 19. The word "processed," as used in WIS. STAT. § 801.05(4)(b), has been construed broadly. *See Kopke*,

---

[11] Salfinger's argument focuses only on whether "products, materials or things" were "processed" by the Fairfax parties and whether those "products, materials or things" were then "used or consumed within this state in the ordinary course of trade." Accordingly, we do not discuss the meaning of "serviced" or "manufactured" within the context of WIS. STAT. § 801.05(4)(b).

[12] We will more fully discuss the process by which advertisements populate the *Sydney Morning Herald* website in our analysis of the due process minimum contacts requirement.

245 Wis. 2d 396, ¶ 17. In *Kopke*, our supreme court recognized that "reasonable minds could differ as to the meaning of [the] statute" and looked to the statute's history in determining how broadly to define the term "process." *See id.* In so doing, the court noted that the long-arm statute was designed to satisfy the due process requirements and that it "expand[s] the exercise of personal jurisdiction in cases having substantial contacts with this state." *Id.* Because the purpose of the statute was to broaden personal jurisdiction, the court adopted the broad definition of "process" offered in *Carson v. Park Industries, Inc.*, 717 F.2d 1120 (7th Cir. 1983). *Kopke*, 245 Wis. 2d 396, ¶ 11. In *Carson*, the Seventh Circuit Court of Appeals highlighted the dictionary definition of the verb "process," which includes "subjecting something to a particular system of handling to effect a particular result and preparing something for market or other commercial use by subjecting it to a process." *Id.*, 717 F.2d at 1124 n.5.

¶ 20. The broad definition of "process" adopted by the supreme court in *Kopke* is broad enough to embrace the *Sydney Morning Herald*'s process of preparing and arranging news and blank spaces for advertising content for the market and subjecting it to information processing so that users in Wisconsin can access articles placed on its website. Attempting to limit the meaning of a broad term such as "process" is contrary to the well-established principle that our long-arm statute is to be liberally construed in favor of exercising personal jurisdiction. *See Rasmussen*, 335 Wis. 2d 1, ¶¶ 16–17. We therefore agree with Salfinger that an article published online is "processed" within the meaning of Wis. Stat. § 801.05(4)(b).

## II. Exercise of jurisdiction over the Fairfax parties would violate due process.

¶ 21.  Having concluded that the Fairfax parties fall within the reach of Wis. Stat. § 801.05(4)(b), we turn to the second step of our analysis:  whether exercise of jurisdiction over the Fairfax parties comports with the constitutional due process requirement. *See Kopke*, 245 Wis. 2d 396, ¶ 22.

¶ 22.  Due process analysis itself presents two inquiries, the first of which is "whether the defendant 'purposefully established minimum contacts in the forum State.' " *See id.*, ¶ 23 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). The plaintiff carries the burden of establishing minimum contacts for due process purposes. *See Kopke*, 245 Wis. 2d 396, ¶ 23. If it is established that the defendant has " '*purposefully* established minimum contacts in the forum State[,]' " *id.* (emphasis added; citation omitted), we may then consider the defendant's forum-state contacts " 'in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice,' " *id.* (citation and one set of quotation marks omitted). The defendant carries the burden on this second inquiry. *See id.* There are five factors that we consider in our due process analysis:  (1) the quantity of the defendant's contacts with the State; (2) the nature and quality of the defendant's contacts with the State; (3) the source and connection of the cause of action with those contacts; (4) the interests of Wisconsin in the action; and (5) the convenience to the

parties of employing a Wisconsin forum.[13] *Rasmussen,* 335 Wis. 2d 1, ¶ 21.

¶ 23.   Our supreme court has stated the following in regard to the application of the first step of our due process analysis:

> Under the Due Process Clause, personal jurisdiction over a nonresident defendant is proper when the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " Minimum contacts requires that " 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.' " Essential to each case is " 'that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " The "purposeful availment" requirement has become the "baseline," the primary focus, of the minimum contacts analysis. "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " A defendant's contact with the forum state must be such that it "should reasonably anticipate being haled into court there."

*Kopke,* 245 Wis. 2d 396, ¶ 24 (brackets in *Kopke;* internal citations omitted).

¶ 24.   At the outset of our due process analysis, we note that the United States Supreme Court has recently reiterated that when addressing minimum

---

[13] These five factors are sometimes also considered in the statutory analysis as well. *See Rasmussen v. General Motors Corp.,* 2011 WI 52, ¶ 21, 335 Wis. 2d 1, 803 N.W.2d 623.

contacts in the context of specific jurisdiction, the inquiry of whether a state may exercise specific jurisdiction over a nonresident defendant focuses on the relationship between the defendant, the forum State, and the litigation. *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). More specifically, *Walden* confirms that the relationship between the defendant and the forum State "must arise out of contacts that the 'defendant *himself*' creates with the forum State," and also notes that the United States Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* at 1122 (citation omitted). "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.' " *Id.* (citation omitted). Moreover, the " 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* "[T]he defendant's conduct . . . must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.*

¶ 25. Salfinger suggests three ways in which the Fairfax parties have "deliberately and successfully exploited, and continue to exploit, the Wisconsin market as part of their general business," thereby satisfying the due process minimum contacts requirement. First, and most significantly for our analysis, Salfinger argues that the Fairfax parties have received online advertising revenue from Wisconsin users, because at least 826,746 Wisconsin users accessed the *Sydney Morning Herald* website between May 23, 2011, and June 16, 2014. Second, Salfinger argues that the

Fairfax parties published *The Wisconsin Agriculturalist,* a magazine specifically targeted at Wisconsin residents, and that the magazine had two full-time employees in Wisconsin. Third, Salfinger argues that the Fairfax parties provide yearly online subscriptions to the *Sydney Morning Herald* to Wisconsin residents. Essentially, Salfinger suggests that these three methods of "exploiting" the Wisconsin market evidence sufficient minimum contacts for due process purposes. We address Salfinger's arguments in reverse order, and our analysis focuses primarily on Salfinger's argument regarding the targeted online advertisements that appear when a Wisconsin user accesses the *Sydney Morning Herald* website.

**A.** *Neither the publication of* **The Wisconsin Agriculturalist** *by a subsidiary of the Fairfax parties nor the eleven Wisconsin subscriptions to the* **Sydney Morning Herald** *website establishes minimum contacts.*

¶ 26.   We begin by addressing Salfinger's suggestions that publication of *The Wisconsin Agriculturalist* magazine by a subsidiary of the Fairfax parties and the approximately eleven online subscriptions of Wisconsin residents to the *Sydney Morning Herald* website establish that the Fairfax parties have established sufficient minimum contacts with this forum. We quickly dispose of both of these suggestions, as neither, alone or together, is sufficient for due process purposes.

¶ 27.   In describing the various parties' relationships to Wisconsin, Salfinger explains that from 2007 through 2012, respondent Fairfax Media Limited "maintained a physical presence in Wisconsin through

331

its ownership of a subsidiary company, Rural Press Limited, which, through its publisher Farm Progress Companies-USA, published a monthly magazine entitled *The Wisconsin Agriculturalist.*" Salfinger additionally states that "[f]rom January 2010 to October 2012, *The Wisconsin Agriculturalist* had two staff persons in Wisconsin." In explaining why these facts are relevant to suggest that the exercise of jurisdiction does not violate due process in this case, Salfinger states:

> The Fairfax Defendants deliberately and successfully exploited, and continue to exploit, the Wisconsin market as part of their general business . . . . [T]he Fairfax Defendants published a magazine specifically targeted at Wisconsin residents, *The Wisconsin Agriculturalist,* and had two full-time staff persons in Wisconsin. Although they no longer were publishing that magazine in October 2010, that publication not only establishes the Fairfax Defendants' connection to the state predating the Salfinger article, but also provided the Fairfax Defendants' information about the state and its citizens that could be used for the Wisconsin-targeted advertising that eventually accompanies the Salfinger article.

¶ 28. While there are numerous issues with Salfinger's suggestion that such activity can serve as a basis for concluding the Fairfax parties engaged in the minimum contacts required by due process, the issue of primary importance for our purpose is that Salfinger fails to explain how the actions and presence of a non-party subsidiary are sufficient for our jurisdictional due process analysis in this case.

¶ 29. In their responsive pleadings, the Fairfax parties affirmatively allege that *The Wisconsin Agriculturalist* was a publication owned by Rural Press

(USA) Limited, a Delaware corporation and *a subsidiary of Fairfax Media Limited,* until it sold the publication in November 2012, which Salfinger does not dispute. However, Salfinger nevertheless fails to explain how or why the non-party *subsidiary*'s presence and actions in Wisconsin establish that the *Fairfax parties* have sufficient minimum contacts with Wisconsin. Salfinger likewise fails to cite to any legal authority to support the position that sufficient minimum contacts can be established through a subsidiary. We will not develop Salfinger's apparent argument that a subsidiary's presence and actions are sufficient for jurisdictional due process purposes for him. *See State v. Pettit,* 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we may decline to address arguments that are not adequately briefed and we will not consider arguments unsupported by references to legal authority).

¶ 30.  Salfinger also argues that the *Sydney Morning Herald* does sufficient business in Wisconsin to establish minimum contacts because it "provide[s] yearly online subscriptions . . . to Wisconsin residents." However, the Fairfax parties assert—and Salfinger does not dispute—that these online subscriptions did not begin until nearly two years *after* the October 2010 publication of the article at issue. While Salfinger argues that we may nevertheless consider these subscriptions in our analysis because the article at issue is "re-published" each time it is viewed, Salfinger fails to provide citation to legal authority supporting the position that an article is "re-published" in a manner relevant to our jurisdictional due process analysis so that we may consider post-October 2010 subscriptions in considering the exis-

tence of minimum contacts. Again, we will not address undeveloped arguments. *See Pettit*, 171 Wis. 2d at 646.

**B. *The Fairfax parties' online publication and corresponding targeted advertising are not sufficient to establish due process minimum contacts.***

¶ 31.   Salfinger's primary argument—that the Fairfax parties established minimum contacts by placing an article into worldwide circulation by publishing it on its website and then profiting financially from Wisconsin advertisements that appear to Wisconsin users accessing the website—provides Salfinger with the strongest minimum contacts argument. There are two related components to this aspect of Salfinger's argument that we must address. The first is the question of whether the Fairfax parties opened themselves up to, effectively, worldwide jurisdiction by simply placing content on the *Sydney Morning Herald* website that is ostensibly viewable anywhere in the world where an internet connection is available. The second aspect of Salfinger's argument relates to the role of the targeted advertisements that appear alongside articles viewed by Wisconsin visitors to the *Sydney Morning Herald*'s website.

¶ 32.   In regard to the alleged worldwide circulation that results when the Fairfax parties place an article on the *Sydney Morning Herald*'s website, Salfinger suggests that we should apply the "stream of commerce" test and rely on the analysis employed in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), rather than the analysis applied in *Calder v. Jones*, 465 U.S. 783 (1984), because the defendant in *Keeton*, as here, was a publisher rather than an author/editor

as was the case in *Calder*. *See Keeton*, 465 U.S. at 772–73; *see Calder*, 465 U.S. at 785–86. Before discussing the applicability of *Keeton* or the "stream of commerce" test, however, we first point out that *Keeton* itself, despite Salfinger's description, does not explicitly refer to the "stream of commerce" analysis. The Fairfax parties point this out and question whether the "stream of commerce" analysis, which has typically been applied in situations where multiple defendants have been involved in the movement of a product from point A to point B and so on, *see e.g., Kopke*, 245 Wis. 2d 396, ¶¶ 2–7, 25–26, even applies in this case.

¶ 33. *Keeton* also does not directly discuss the concept and role of foreseeability, which plays an important role in the due process analysis where a plaintiff argues that jurisdiction may be exercised over a defendant due to the defendant's role in moving a product through the "stream of commerce." *See Kopke*, 245 Wis. 2d 396, ¶ 26 ("The relevance of the stream of commerce test in personal jurisdiction analysis is related to the issue of foreseeability."). However, *Keeton does* cite *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286 (1980), a case in which the United States Supreme Court *did* apply the "stream of commerce" test, stating that "[w]here, as in this case, respondent . . . has continuously and deliberately exploited the [forum's] market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *Keeton*, 465 U.S. at 781. This is the language typically employed in analyzing the concept of foreseeability in the context of the "stream of commerce" test. *See World-Wide Volkswagon*, 444 U.S. at 297. *Keeton* also states, however that "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the

335

forum, and the litigation.' " *Id.* at 775 (citation omitted).[14] This is the analysis the Supreme Court recently reiterated in *Walden. See id.*, 134 S. Ct. at 1126.

■■■■

¶ 34.   Nevertheless, whether we construe our analysis as applying the "stream of commerce" test or not, the outcome in this case is the same. Assuming, for example, that the "stream of commerce" test articulated in *World-Wide Volkswagon* does apply here, as Salfinger argues, we must consider the issue of foreseeability. *See Kopke*, 245 Wis. 2d 396, ¶ 26. However, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State." *World-Wide Volkswagon*, 444 U.S. at 297. Rather, the foreseeability that is critical to the due process analysis when the "stream of commerce" test is applied is "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* This is, in effect, similar to the analysis applied in *Keeton*, which explained that the minimum contacts analysis must focus "on 'the relationship among the defendant, the forum, and the litigation.' " *Keeton*, 465 U.S. at 775 (citation omitted). In other words, under either approach, the analysis ultimately looks to the defendant's relationship with and connection to the forum through some type of

---

[14] We point out that although Salfinger argues that *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder v. Jones*, 465 U.S. 783 (1984), apply different tests based on whether a defendant placed a product into circulation (*Keeton*) or intentionally targeted the forum (*Calder*), *Calder* uses the same language as *Keeton*: "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.' " *Calder*, 465 U.S. at 788 (citation omitted).

conduct that the defendant purposefully undertook and whether the defendant would understand that conduct to open the door to jurisdiction in that forum.

¶ 35. Turning to Salfinger's suggestion that we follow the analysis set forth in *Keeton*, we recognize that Salfinger seeks to draw a parallel with *Keeton* because the Fairfax parties, like the defendant in *Keeton*, are media publishers who place a publication into circulation. Salfinger's reliance on *Keeton* is somewhat misplaced in this regard, however, because Salfinger, in focusing on the *type* of defendant in *Keeton*, overlooks that the analysis applied in *Keeton*, as is the case in all other personal jurisdiction cases, focuses on the defendant's purposeful contact with the forum state. Importantly, the United States Supreme Court's analysis in *Keeton* focused on the "purposeful" and "regular circulation of magazines in the forum State," and the fact that the magazine was a national publication targeting a nationwide audience. *Id.*, 465 U.S. at 773–74. That conduct was sufficient for the Supreme Court to conclude that " [s]uch regular monthly sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* at 774.

¶ 36. Unfortunately for Salfinger, applying the *Keeton* analysis, whether we view the analysis as applying the "stream of commerce test" with a consideration of foreseeability that the Fairfax defendants would be haled into a Wisconsin court based on their conduct and connection with this forum, *see World-Wide Volkswagon*, 444 U.S. at 297, or whether we instead simply consider the relationship between the Fairfax parties, Wisconsin, and this litigation, *see Keeton*, 465 U.S. at 775, leads us to the conclusion that the Fairfax parties do not have sufficient minimum contacts with Wisconsin.

¶ 37. Applying the minimum contacts analysis to this case, it is essentially undisputed that in placing content on the *Sydney Morning Herald* website, the Fairfax parties could have reasonably understood that content placed on the website would ostensibly be accessible anywhere in the world with an internet connection. However, that alone is simply not sufficient to establish minimum contacts with a forum. *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 446 (7th Cir. 2010) (it is not sufficient to show that a defendant maintained a website accessible from the forum). To the contrary, merely placing an article online on an Australian newspaper's website, particularly where the article does not even mention Wisconsin, fails to evince *any* connection with or conduct in Wisconsin.

¶ 38. There is also no dispute that the *Sydney Morning Herald* is an Australian publication with a primarily Australian-targeted audience, and while there may be some international interest in the *Sydney Morning Herald,* there is no sincere argument that the *Sydney Morning Herald*'s target audience includes Wisconsin.[15] Moreover, the article at issue neither mentions Wisconsin nor even suggests that there is any connection between Salfinger and Wisconsin at all. Not even the one offending sentence that Salfinger complains about—that he "face[d] prosecution in the US after allegedly producing a revolver at his daughter's wedding"—identifies a specific state. Rather, the article describes Mr. Salfinger as being Australian-born, as having business connections to Israel, and as being embroiled in litigation in Israel and Australia. There is

---

[15] This is in contrast to the national United States publication targeted at a nationwide United States audience considered in *Keeton. See id.*, 465 U.S. at 781.

nothing in or about the article that is remotely related to Wisconsin other than the apparent fact that Salfinger, unbeknownst to the Fairfax parties at the time, had moved to Wisconsin a few months prior to the article being published, and "mere injury to a forum resident is not sufficient connection to the forum." *Walden*, 134 S. Ct. at 1125.

■

¶ 39. Thus, while it may have been theoretically foreseeable to the Fairfax parties that someone in Wisconsin might access the *Sydney Morning Herald* website because individuals in Wisconsin have access to the internet, we do not believe that the Fairfax parties' publication of an article on the *Sydney Morning Herald* website, *without more,* evidences either conduct or a connection with the State of Wisconsin such that they should have reasonably anticipated being haled into a Wisconsin court. As the United States Supreme Court very recently reiterated, the proper focus of the due process analysis is "whether the defendant's conduct connects him to the forum in a *meaningful* way," *see Walden*, 134 S. Ct. at 1124 (emphasis added). We are not convinced that the fact that Wisconsin users have accessed the *Sydney Morning Herald* website connects the Fairfax parties to Wisconsin in any meaningful way.

¶ 40. This conclusion is in agreement with the Seventh Circuit Court of Appeals' recognition that courts should be cautious " 'in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state.' " *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) (citation omitted). As the court went on to state, " [i]f the defendant merely

operates a website, even a 'highly interactive' website, that is accessible from, *but does not target,* the forum state, then the defendant may not be haled into court in that state without offending the Constitution." *Id.* at 559 (emphasis added). In other words, the Seventh Circuit Court of Appeals indicated that where a foreign defendant's website is accessible from a forum state, there must be "something more" that accompanies that accessibility to bring the exercise of jurisdiction within due process.

¶ 41.   This leads us to the second aspect of Salfinger's argument:   that as a result of the targeted advertisements that appear alongside the articles on the *Sydney Morning Herald*'s website when a Wisconsin user accesses the website, the Fairfax parties have established minimum contacts because the advertisements target users located in Wisconsin. Stated differently, do the Wisconsin-targeted advertisements amount to that "something more" that targets a forum beyond simply maintaining a website that is merely accessible from the forum that brings the exercise of jurisdiction within the bounds of due process?

¶ 42.   Most internet users are likely familiar with the general concept of local and interest-based advertisements appearing on a user's internet browser based on the user's IP address and "cookies" stored in the memory of the user's computer. For the purpose of our due process analysis, a brief explanation of the process by which local advertisements are placed on the *Sydney Morning Herald*'s website, as explained in expert witness Shlomo Samaet's affidavit, submitted on Salfinger's behalf, is helpful.

¶ 43.   Samaet, an Information Technology specialist with specialization in internet advertising and search engine optimization techniques, reviewed the

article at issue in Salfinger's lawsuit and concluded that the Fairfax parties employed an online advertising system that allowed for revenue from advertisements displayed to a user who accesses the *Sydney Morning Herald*'s website. According to Samaet's explanation, the software code used to display advertisements to a user visiting the *Sydney Morning Herald* website uses a targeted delivery system for advertisements that is based on the user's geographic location. Samaet explained that when he visited the article at issue on his computer "using a Wisconsin Proxy address,"[16] the advertisements that appeared alongside the article were advertisements "placed by Wisconsin businesses and directed towards Wisconsin consumers."

¶ 44.   The effect of using a software code that tracks a user's geographic location and interests, Samaet explains, is to "provide[] for dynamic placement of advertising that is controlled by tags of past activity and tracked user site access or by special computer code referred to as 'cookies' that are often secretly loaded onto the website visitor's computer." Samaet explained how the "tag" software used on the *Sydney Morning Herald* website would populate advertisements to a user as follows:

> A tag is a software term that enables the code to automatically place a tag on a web visitor according to various parameters such as geographical location, ie: Wisconsin, and previous areas of interest of the web visitor, for example a web user may have visited a medical health care site. The tag will identify the

---

[16] We understand this to mean that Samaet used an IP address associated with a Wisconsin location for the sole purpose of conducting his analysis, even if he was not actually located in Wisconsin at the time.

visitor as from Wisconsin and previously interested in medical health care issues and might then return an advertisement for the Aurora Medical Center in Milwaukee.

Tags enable different advertisements to be delivered to the Web Page, which are brought into the page. This also allows the advertisements to automatically rotate or change when a user refreshes the browser.

(Spelling and grammatical errors have been corrected.)

¶ 45. Samaet concluded that the *Sydney Morning Herald* uses geographically targeted advertising techniques that provide advertisements relevant to Wisconsin to Wisconsin internet users who access the *Sydney Morning Herald* website. Samaet also noted that use of this software would function similarly if an internet user accessed the *Sydney Morning Herald* from a non-Wisconsin location. For example, Samaet stated that if an internet user views the website in England, the user will see localized advertisements for English businesses based on the user's location. Samaet further explained that third-parties such as Google, Adobe, and Double Click also play a role in local advertisement placement: "[t]he code in the [*Sydney Morning Herald*] website takes the advertisements that are fed to the [*Sydney Morning Herald*] by the likes of Google ads and Double Click and places them on the web page being viewed by a visitor."

¶ 46. Summarizing Samaet's averments in more colloquial terms, the *Sydney Morning Herald* contains blank spaces on its website layout where advertisements can be populated in accordance with a user's location or interests, as revealed by "cookies" placed on the user's computer. While Samaet seems to suggest that the *Sydney Morning Herald* places "cookies" on a user's website when the user accesses the *Sydney*

*Morning Herald* website and that those "cookies" play a role in the placement of local advertisements that appear to a user, Samaet also seems to suggest that "cookies" previously stored from prior internet searches—including "cookies" entirely unrelated to the *Sydney Morning Herald*—play a role in populating targeted advertisements on a user's internet browser as well. This is clear from his example that an Aurora Healthcare Center advertisement might appear on the browser of a Wisconsin user visiting the *Sydney Morning Herald* website who has also previously searched for healthcare information on the internet.

¶ 47.   Samaet's affidavit also suggests that third parties, in addition to the user and the Fairfax parties, play a role in the appearance of targeted advertisements. Specifically, Samaet stated that "[t]he code in the [*Sydney Morning Herald*] website *takes the advertisements that are fed to the [Sydney Morning Herald] by the likes of Google ads and Double Click* and places them on the web page being viewed by a visitor." (Emphasis added.) This suggests that there are, at a minimum, advertising agreements between the Fairfax parties and third-parties such as Google and Adobe. Moreover, although Samaet does not explicitly explain how third parties such as Google determine which local advertisements to "feed" to a website such as the *Sydney Morning Herald,* it is reasonable to infer that those local businesses whose advertisements appear also have advertisement agreements with third parties such as Google and Adobe.

¶ 48.   Based on this relatively limited "behind the scenes" explanation of how targeted advertising appears on a user's internet browser when visiting the *Sydney Morning Herald* website, it appears that numerous parties—the user, businesses that purchase

343

advertisement space, third parties such as Google and Adobe, *and* the Fairfax parties—ultimately play a role in which advertisements appear to a user accessing the *Sydney Morning Herald* website. For example, a user located in Germany would see local German advertisements when visiting the *Sydney Morning Herald* website because the user's computer is identified as being in Germany, a local German business presumably has purchased internet advertising, and a party such as Google, as explained by Samaet, would then "feed" that information to the *Sydney Morning Herald* website so that a local German advertisement would appear to a German user. This same result would occur regardless of whether the user accesses the *Sydney Morning Herald* website from Alaska, where local Alaskan advertisements would appear, or whether the user accesses the website from Wisconsin and therefore sees local Wisconsin advertisements. Thus, the record indicates that Wisconsin-based advertisements only appear on the *Sydney Morning Herald* website when a Wisconsin user first chooses to connect to that website.[17]

¶ 49. In light of this online advertising process, the trial court correctly recognized that the only real connection the Fairfax parties—Australian and New Zealand companies—have to Wisconsin "consist[s] of advertisements targeted to Wisconsin residents." However, based on the record before us, it simply is not clear that the Fairfax parties actually have a significant—or any—role in the specific Wisconsin-based advertisements appearing on the screen of a

---

[17] There is no suggestion anywhere in the record that Wisconsin advertisements appear to users located outside of Wisconsin.

user accessing the *Sydney Morning Herald* website from Wisconsin. As the trial court concisely stated:

> [T]hese advertisements do not appear in print or broadcast or outdoor media here in Wisconsin. They are not part of some effort here to drum up business here, or even to lure Wisconsin residents to the defendants' websites. These advertisements merely greet Wisconsin residents who themselves take the initiative to visit the defendants' websites.

¶ 50. In other words, the record does not establish that the Fairfax parties proactively take any affirmative or purposeful step in directly targeting Wisconsin internet users or in independently placing Wisconsin-based advertisements on the *Sydney Morning Herald* website. Rather, the record suggests only that the Fairfax parties leave blank advertising spaces on the website formatting so that a third-party intermediary they contract with, such as Google or Adobe, can then fill in those blank spaces with advertisements of local businesses that Google or Adobe also contracts with. The local advertisements targeted toward a user accessing the *Sydney Morning Herald* are simply based on the user's geographic location and interests.

¶ 51. Accordingly, based on this record, it appears that this process of placing local advertisements on the *Sydney Morning Herald* is entirely dependent not only upon the agreements between various parties, but also upon the location of the user who chooses to access the *Sydney Morning Herald* website. This does not establish that the Fairfax parties have proactively and purposefully reached out or targeted Wisconsin in any way simply because local Wisconsin advertisements appear on the screen of an internet user accessing the *Sydney Morning Herald* website from Wiscon-

sin.[18] Rather, this appears to be the type of "random, isolated, or fortuitous conduct" that precludes exercise of personal jurisdiction. *See Keeton*, 465 U.S. at 774. Because the record neither clearly nor sufficiently establishes that the Fairfax parties actually control the placement of local Wisconsin advertisements to Wisconsin users, we conclude that the Fairfax parties have not engaged in conduct or activity that targets or has any connection with the State of Wisconsin. The Fairfax parties therefore do not have sufficient minimum contacts with the State of Wisconsin, and exercising jurisdiction in this case would violate due process.[19]

¶ 52. Having concluded that the Fairfax parties do not have sufficient minimum contacts with the State of Wisconsin for due process purposes under the first prong of our due process analysis, we do not address the second prong, which considers the defen-

---

[18] Salfinger also suggests there is a connection to Wisconsin because an individual can enter Salfinger's name into a Google search and the first "hit" that appears is the article at issue. Again, this is an example of an internet user reaching out in the first instance, and moreover, entering a search term into an internet search engine such as Google allows that search engine—a third party—to provide "hits" for the term searched. There is no indication in the record that the *Sydney Morning Herald* itself is involved in how Google returns "hits" in response to a Google search, and the fact that the article is the first "hit" to appear when searching the name "Salfinger," presumably regardless of where in the world the user is located, also does not establish any contact with Wisconsin.

[19] This is not to say that there can never be an exercise of jurisdiction over a foreign defendant who makes content available worldwide by placing it on the internet. This, however, is simply not that case, because the Fairfax parties' contacts with the forum state are too fortuitous and too attenuated to exercise jurisdiction within the bounds of due process.

dants' contacts with the forum in light of other factors to determine whether exercise of personal jurisdiction would comport with fair play and substantial justice. *See Kopke*, 245 Wis. 2d 396, ¶ 23.

*By the Court.*—Order affirmed.