# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2018AP1555

Complete Title of Case:

### CITGO PETROLEUM CORPORATION,

#### PLAINTIFF-RESPONDENT,

#### V.

### MTI CONNECT, LLC D/B/A BLACK CANYON,

#### DEFENDANT,

### MGAGE, LLC,

#### DEFENDANT-APPELLANT.

---

| | |
|---|---|
| Opinion Filed: | August 18, 2020 |
| Submitted on Briefs: | June 19, 2019 |
| Oral Argument: | |

---

| | |
|---|---|
| JUDGES: | Brash, P.J., Dugan and Gundrum, JJ. |
| Concurred: | |
| Dissented: | |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Thomas M. Burnett* and *Malinda J. Eskra* of *Reinhart Boerner Van Deuren s.c.* in Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Scott C. Solberg* and *Gregory Schweizer* of *Elmer Stahl LLP* in Chicago, Illinois and *Trevor J. Will* and *Gregory N. Heinen* of *Foley & Lardner LLP* in Milwaukee. |

COURT OF APPEALS
DECISION
DATED AND FILED

August 18, 2020

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1555**

STATE OF WISCONSIN

Cir. Ct. No. 2017CV12128

IN COURT OF APPEALS

---

CITGO PETROLEUM CORPORATION,

PLAINTIFF-RESPONDENT,

V.

MTI CONNECT, LLC D/B/A BLACK CANYON,

DEFENDANT,

MGAGE, LLC,

DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: TIMOTHY M. WITKOWIAK, Judge. *Order reversed and cause remanded with directions*.

Before Brash, P.J., Dugan and Gundrum, JJ.

¶1     DUGAN, J.  mGage, LLC, appeals the trial court's nonfinal order denying its motion to dismiss CITGO Petroleum Corporation's complaint on the grounds of lack of personal jurisdiction.[1]  The sole issue on appeal is whether mGage is subject to specific personal jurisdiction in Wisconsin.

¶2     mGage argues that the trial court erred in finding personal jurisdiction under Wisconsin's long-arm statute, WIS. STAT. § 801.05, and erred in finding that mGage's due process rights were not violated because specific jurisdiction exists in this case.  For the reasons stated below, we agree with mGage that exercising personal jurisdiction over mGage would violate its due process rights.[2]  We, therefore, reverse and remand with directions that mGage's motion be granted.

## Background

### The parties

¶3     MTI Connect, LLC, doing business as Black Canyon, is a Wisconsin limited liability company with its principal place of business in Milwaukee.  MTI is

---

[1] This court granted mGage leave to appeal the August 18, 2018 nonfinal order of the Honorable Timothy M. Witkowiak denying mGage's motion to dismiss.  *See* WIS. STAT. RULE 809.50(3) (2017-18).

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] CITGO must establish both personal jurisdiction under Wisconsin's long-arm statute and that the exercise of personal jurisdiction over mGage comports with due process.  Because we conclude that the exercise of personal jurisdiction over mGage, under the facts in this case, fails to comport with due process requirements, we need not address the issue of whether Wisconsin's long-arm statute grants jurisdiction in this case.  *See* **Sweet v. Berge**, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (stating we need not address all issues when deciding the case on other grounds); *see also* **Steel Warehouse of Wis., Inc. v. Leach**, 154 F.3d 712, 714 (7th Cir. 1998) (concluding that the plaintiff failed to satisfy the constitutional requirements for jurisdiction without resolving whether defendants came "within the grasp of the Wisconsin long-arm statute").

a mobile messaging company that carries out marketing campaigns for its clients, which include text messaging components.[3]

¶4    CITGO is a Delaware corporation with its principal place of business in Texas.  In 2014, CITGO retained MTI to administer a promotional texting program.

¶5    mGage, a limited liability company organized under Delaware law with its principal place of business in Atlanta, Georgia, is a mobile messaging company that assists clients in communicating via text messaging with the client's customers through cellular telephones, electronic tablets, and other mobile devices. mGage permits its clients to use mGage's proprietary messaging platform, which allows those clients to create, manage, send, and receive text messages to and from their customers.

¶6    mGage's clients reach its platform through its website portal that permits access to the platform using login credentials provided by mGage.  An mGage client accesses the platform and enters instructions as to how it wants to conduct a text messaging campaign.  mGage has contractual relationships with telecommunications carriers who ultimately deliver the text messages through the mGage gateway to recipients' individual mobile devices.  The portal used by mGage's clients is hosted on servers in Los Angeles, California.  The software and hardware comprising mGage's platform are also located in California.

---

[3] We may take judicial notice of CCAP records in this action that reflect that MTI has not made an appearance in the case.  *See **Kirk v. Credit Acceptance Corp.***, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522.  (CCAP is an acronym for the Wisconsin Consolidated Court Automation Programs.  The online website reflects information entered by court staff.)

¶7      Although both mGage and MTI are mobile messaging companies, MTI does not have any contracts with carriers under which MTI could route its clients' text messages to the carriers. In this case, MTI contracted with mGage to route MTI's clients' text messages to the carriers and the carriers would then deliver the messages to the recipients.

### CITGO's contract with MTI

¶8      Beginning in 2015, CITGO sponsored a number of text-to-win sweepstakes at various concert venues, amusement parks, and other smaller events, as well as contests advertised at gas stations. One purpose of the contests was to obtain entrants' mobile phone numbers for future text-based promotions.

¶9      Pursuant to the CITGO/MTI contract, MTI was the administrator of CITGO's text messaging programs. Each sweepstakes program was supposed to employ a double opt-in protocol whereby the contestants were required to "Reply 'Y'" to a confirmatory text that, among other things, solicited each individual's consent to receive future text messages from CITGO as required by federal law.[4]

### The Florida lawsuit

¶10      In August, October, and November 2016, using mGage's text-messaging service, MTI sent text messages on CITGO's behalf to tens of thousands of people whose mobile phone numbers MTI obtained during the sweepstakes contests. An individual who received those text messages filed a federal class action

---

[4] The sweepstakes rules contained additional disclosures about future text messages that would be sent on CITGO's behalf.

lawsuit in November 2016 against CITGO in a Florida federal district court, alleging claims under the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227.[5] From discovery documents that CITGO obtained in the Florida federal class action, CITGO learned that the plaintiff and tens of thousands of other sweepstakes entrants did not receive the confirmatory "Reply 'Y'" opt-in text, contrary to the double opt-in protocol that CITGO had authorized and approved and that MTI had promised to use.

### *CITGO's lawsuit against mGage*

¶11 After settling the Florida federal class action for eight million dollars plus three hundred thousand dollars in costs, CITGO commenced this action in Wisconsin against MTI and mGage seeking to recover the amounts that it paid to settle the Florida federal class action. As to mGage, CITGO alleges that it breached its duty as a subagent, was negligent, and made negligent and strict liability misrepresentations.

### *MTI's contract with mGage*

¶12 MTI and mGage entered into a contract on January 1, 2016, which gave MTI the right to access and use mGage's platform that allowed MTI to create, manage, send, and receive text messages to and from those individuals who received MTI's text messages. Pursuant to the contract, CITGO or MTI created the text

---

[5] The TCPA prohibits using an "automatic telephone dialing system" (ATDS or auto dialer) to "make any call ... to any telephone number assigned to a ... cellular telephone service" without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). Persons injured by calls made in violation of the TCPA may bring private actions against the violators. 47 U.S.C. § 227(b)(3). The TCPA allows a prevailing plaintiff to recover $500 per violation, or $1500 per violation, if the plaintiff proves that the violation was willful or knowing. *See* 47 U.S.C. § 227(b)(3)(B)-(C).

All references to the TCPA of 1991, 47 U.S.C. § 227 (2016) are to the 2016 version.

messages for CITGO's text messaging program using mGage's platform located in California. Then pursuant to the contract mGage routed MTI's text messages to the carriers and the carriers then delivered the text messages to the individuals that MTI identified. We discuss the MTI agreement in further detail below.

### *Procedural history*

¶13 CITGO filed this suit on October 23, 2017, against MTI and mGage. On February 22, 2018, mGage filed a motion to dismiss for lack of personal jurisdiction. CITGO filed a response to the motion and mGage filed a reply. The trial court held a motion hearing on June 12, 2018 and, thereafter, on August 1, 2018, issued a written decision denying mGage's motion. The trial court found that CITGO had established personal jurisdiction under the Wisconsin long-arm statute, WIS. STAT. § 801.05(5), and that the exercise of personal jurisdiction in this case satisfies due process concerns because mGage purposefully established "minimum contacts" in Wisconsin.

¶14 This appeal followed.

### DISCUSSION

¶15 CITGO argues that the trial court properly found that specific personal jurisdiction over mGage existed under Wisconsin's long-arm statute and that exercising personal jurisdiction over mGage was proper under constitutional principles of due process. mGage argues that both of these findings were in error. We conclude that CITGO failed to show that mGage has sufficient minimum contacts with Wisconsin to satisfy the Fourteenth Amendment's due process clause and, therefore, the trial court erred in denying mGage's motion to dismiss.

6

## I. STANDARD OF REVIEW

¶16    Both parties agree that whether a party is subject to personal jurisdiction in Wisconsin is a question of law, which this court reviews *de novo*. *See Rasmussen v. Gen. Motors Corp.*, 2011 WI 52, ¶14, 335 Wis. 2d 1, 803 N.W.2d 623.  A court decides this issue using a two-step inquiry.  *See id.*, ¶16; *Kopke v. A. Hartrodt S.R.L.*, 2001 WI 99, ¶8, 245 Wis. 2d 396, 629 N.W.2d 662.  First, the court determines whether the defendant is subject to personal jurisdiction under Wisconsin's long-arm statute, WIS. STAT. § 801.05.  *See Kopke*, 245 Wis. 2d 396, ¶8.  Second, if the court determines that the statute is satisfied, it then determines "whether the exercise of jurisdiction comports with due process requirements." *See id.* CITGO "has a 'minimal burden' of showing that the statutory and constitutional requirements are met." *See Rasmussen*, 335 Wis. 2d 1, ¶17 (citation omitted).  "The limits of due process are … established by the rules set forth in the decisions of the United States Supreme Court." *Salfinger v. Fairfax Media Ltd.*, 2016 WI App 17, ¶14, 367 Wis. 2d 311, 876 N.W.2d 160 (citing *Kopke*, 245 Wis. 2d 396, ¶22; ellipses in *Kopke*).

## II. DUE PROCESS ANALYSIS

¶17    There are two types of personal jurisdiction—general and specific—that can satisfy the requirements of due process. *See Segregated Account of Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 2017 WI 71, ¶¶10-11, 376 Wis. 2d 528, 898 N.W.2d 70.  CITGO does not argue that mGage is subject to

general personal jurisdiction.[6]  Rather, the issue here is whether mGage is subject to specific jurisdiction.  Specific jurisdiction exists where the action before the court arises from or relates to the defendant's contacts with the forum state.  ***Tamburo v. Dworkin***, 601 F.3d 693, 702 (7th Cir. 2010).  Specific personal jurisdiction only exists where the defendant's contacts with the forum state "directly relate to the challenged conduct or transaction."  ***Id.***

¶18     "The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant."  ***World-Wide Volkswagen Corp. v Woodson***, 444 U.S. 286, 291 (1980).  "[A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State."  ***Id.*** (citation omitted).  "[T]he defendant's contacts with the forum State must be such that maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'"  ***Id.*** at 292 (citations and one set of quotation marks omitted).  "[F]oreseeability" of injury in the forum State "alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause."  *See id.* at 295.  Instead, "the foreseeability that is critical to [the] due process analysis … is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  ***Id.*** at 297.

¶19     The "touchstone" of the due process analysis for specific personal jurisdiction is "whether the defendant purposefully established 'minimum contacts'

---

[6] General jurisdiction exists in actions where the defendant has contacts with the forum state that are "so substantial and of such a nature as to justify suit against [such defendant] on causes of action arising from dealings entirely distinct from those activities."  ***Segregated Account of Ambac Assurance Corp. v. Countrywide Home Loans, Inc.***, 2017 WI 71, ¶11, 376 Wis. 2d 528, 898 N.W.2d 70 (citation omitted).  If general jurisdiction is established the defendant can be sued on any claim in the forum State.  *See **Daimler AG v Bauman***, 571 U.S. 117, 127 (2014).

in the forum State." ***Burger King Corp. v. Rudzewicz***, 471 U.S. 462, 474 (1985) (citation omitted). In ***Hanson v. Denckla***, the United States Supreme Court explained that to establish specific personal jurisdiction, "there [must] be some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *See id.*, 357 U.S. 235, 253 (1958). It also stated that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *See id.* "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" ***Burger King***, 471 U.S. at 475 (citations omitted).

¶20 When addressing minimum contacts in the context of specific personal jurisdiction, "[t]he inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." ***Walden v. Fiore***, 571 U.S. 277, 283-84 (2014) (citations and one set of quotation marks omitted). The ***Walden*** court also stated that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *See id.* at 284. The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction.… Contacts between the plaintiff or other third parties and the forum do not satisfy this requirement." ***Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.***, 751 F.3d 796, 801 (7th Cir. 2014) (citation omitted; second set of brackets added).

9

¶21    Applying the foregoing principles, we conclude that mGage lacks the "minimal contacts" with Wisconsin that are a prerequisite to exercise personal jurisdiction over it.  To decide whether specific personal jurisdiction may be exercised, a court must engage in three distinct steps:

> (1) identify the contacts the defendant has with the forum; (2) analyze whether these contacts meet constitutional minimums and whether exercising jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; [and] (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit.

*GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009) (citation omitted).

### *mGage's contacts with Wisconsin*

¶22    Here, the trial court found the necessary minimum contacts based on several facts:  (1) mGage knowingly contracted with MTI, a Wisconsin-based company; (2) the contract represented to MTI that MTI could only access mGage's platform from within Wisconsin; (3) during the life of the contract, at least fourteen mGage employees communicated with MTI via phone or email, and these employees were aware that they were contacting and providing support for a Wisconsin company; and (4) while the text messages were not solely sent to Wisconsin numbers, mGage's platform was still used to send a substantial amount of text messages to Wisconsin numbers.  In our view, none of these contacts meets the standards that the United States Supreme Court has set.

¶23    mGage's sole contact with Wisconsin is its contract with MTI.  This is not a viable basis upon which to hale mGage into Wisconsin's courts.  A corporation's "contract with an out-of-state party *alone*" is not enough to

10

automatically establish the requisite minimum contacts. *See Burger King*, 471 U.S. at 478. In *Burger King*, the court explained that:

> [A] "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Id.* at 479 (citation omitted).

¶24 In determining whether mGage purposefully established minimum contacts within Wisconsin, we begin by addressing the factors identified in *Burger King*.

### The negotiations involved in the MTI/mGage contract

¶25 MTI negotiated the contract with mGage via phone calls and emails, and the parties entered into the contract in January 2016.[7] No mGage employee traveled to Wisconsin to negotiate or execute the contract.

¶26 CITGO argues that the negotiations of the MTI/mGage contract constitute sufficient minimum contacts. It argues that mGage entered into the contract with MTI, knowing that MTI was a Wisconsin company and negotiated the

---

[7] CITGO asserts that MTI previously had a contract with a company named Outspoken, Inc. to provide text messaging services for marketing campaigns that MTI conducted on behalf of its customers and that on December 30, 2014, mGage acquired Outspoken and was the successor to the Outspoken/MTI contract. In 2016, mGage entered into the contract with MTI noted above.

The parties do not provide any facts regarding the Outspoken/MTI contract and they do not provide any facts regarding the 2016 contract negotiations between mGage and MTI except that the negotiations involved phone calls and emails.

contract via phone calls and emails. However, as noted above, a corporation's contract with an out-of-state party alone is insufficient to establish the requisite minimum contacts. *See Burger King*, 471 U.S. at 478.

¶27 CITGO further cites *Brown v. LaChance*, 165 Wis. 2d 52, 68, 477 N.W.2d 296 (Ct. App. 1991), in arguing that the emails and phone calls during negotiations support exercising jurisdiction over mGage. However, even CITGO notes that the *Brown* court merely stated that exchanging mail and telephone communications with two Wisconsin-based attorneys were "significant" contacts.[8] However, it did not hold that those contacts, without more, constituted sufficient minimum contacts, and CITGO cites no authority for that proposition.

¶28 Moreover, as explained in *Burger King*, the contemplated future consequences, along with the terms of the contract and the parties' actual course of

---

[8] *Brown v. LaChance* held that the state court had personal jurisdiction over a Massachusetts law firm that had used the services of a Wisconsin law firm pertaining to a Wisconsin real estate transaction. *See id.*, 165 Wis. 2d 52, 66-69, 477 N.W.2d 296 (Ct. App. 1991).

The Massachusetts law firm was primary counsel for a Massachusetts resident who loaned funds to a Wisconsin resident as an investment in Wisconsin real estate. *See id.* at 58. It engaged the Wisconsin firm to perform certain services including making sure certain documents complied with Wisconsin law, recording such documents, filing Uniform Commercial Code statements, and disbursing funds. *See id.*

In analyzing the due process issue, the *Brown* court stated that although the number of contacts were unknown, and even assuming that the contacts were few, they were significant. *See id.* at 68. The court explained,

> The contacts consisted of mailing documents to and communicating by mail and phone with [the law firm] in Wisconsin. The documents that [the Massachusetts law firm] mailed to Wisconsin (loan agreement, mortgage, note, security agreement, subordination agreement and financing statements) were drafted by [the Massachusetts law firm], dealt with the [Wisconsin] transaction and had substantial legal significance.

*Id.* The sparse facts of this case regarding the contract negotiations are not comparable to those of *Brown*.

12

dealings, must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. *Id.* at 479.

¶29     Based on the record before us, we conclude that the negotiations involving the contract do not constitute sufficient minimum contacts under the Due Process Clause. We turn next to the terms in the contract.

### The terms of the MTI/mGage contract

¶30     CITGO argues that the plain terms of the contract restricted MTI's access to mGage's platform to MTI's "'Company System,' *i.e.*, its 'computer hardware and software system,' all of which is located in Wisconsin." It then asserts that mGage's own contract represented to MTI that MTI could only use the mGage platform from within Wisconsin, making it clear that mGage knew or should have known that its services would be accessed in Wisconsin.

¶31     We conclude that CITGO's reading of the contract is clearly wrong. The terms of the contract do not require that MTI could only access mGage's platform using MTI's computers in Wisconsin. The agreement merely states that "[t]he Messaging Application shall be accessible by [MTI] from the [MTI] System only as expressly prescribed by mGage." Under the plain language of the contract, MTI could access mGage's platform from anywhere in the United States as long as MTI was using its company system.

¶32     In *University Accounting Service LLC. v. ScholarChip Card LLC.*, the federal district court was faced with similar facts. *See id.*, No. 17-CV-901-JPS, 2017 WL 4877418, at *6-9 (E.D. Wis. Oct. 27, 2017). There, the parties entered into written agreements under which the defendant, a New York limited liability company, developed and hosted a cloud based software platform system which the

plaintiff, a Wisconsin based limited liability company, and its customers or employees could access remotely through the internet. *See id.* at *1-2. In arguing that the Wisconsin courts had personal jurisdiction, the plaintiff argued that the defendant always accessed the data remotely from Wisconsin and that the defendant knew that. *See id.* at *7. The court stated that "[b]ut it was [plaintiff's] choice to use out-of-state servers" and that "[t]he 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citation omitted). The court further stated,

> [The plaintiff's] presence in Wisconsin is not relevant to the development, hosting, or data-delivery services it purchased from [the defendant], since it could just as easily uproot to Alaska, Alabama, or any other state, without [the defendant's] involvement. Because "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with the other persons affiliated with the State," *Walden*, [the plaintiff's] choice of location cannot control in this instance.

*University Accounting*, 2017 WL 4877418, at *7. Like the plaintiff in *University Accounting*, MTI made the choice to use out-of-state servers, and it could just as easily uproot or expand offices to any other state without mGage's involvement. *See id.*

¶33    As the United States Supreme Court has stated, "The unilateral activity of those who claim some relationship with the nonresident defendant cannot satisfy the requirement of contact with the forum State." *See Hanson*, 357 U.S. at 253; *see also Burger King*, 471 U.S. at 475. Therefore, MTI's choice of location where it accesses mGage's platform does not give rise to a reasonable expectation that mGage could be haled into court in Wisconsin.

14

¶34 CITGO also asserts, however, that the contract does not involve a one time transaction, but rather a long term agreement, which continued the prior long term business relationship between MTI and Outspoken.[9] Citing **Burger King**, CITGO then argues that, by entering into a long-term contract with MTI, mGage purposefully availed itself of the benefit and protection of Wisconsin's laws. *See id.* at 474. CITGO oversimplifies the holding in **Burger King**.

¶35 **Burger King** involved a very complicated and extensive franchise agreement. The court stated that "[e]schewing the option of operating an independent local enterprise, [the defendant] deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479-80 (citation omitted; second set of brackets in **Burger King**). The court did not hold that anyone who enters into a long-term agreement purposefully avails himself or herself of the benefit and protection of the forum State's laws.

¶36 Moreover, a nine-year contract between parties does not necessarily constitute sufficient minimum contacts to support personal jurisdiction. *See Northern Grain Mktg., LLC v. Greving*, 743 F.3d 487, 496 (7th Cir. 2014). The court stated,

> We recognize that Greving didn't just have one contract for a discrete delivery of grain. He recontracted with Northern Grain from time to time for about nine years. And he did this knowing that Northern Grain was based in

---

[9] Although CITGO argues that MTI and Outspoken had a long-term business relationship, in its brief CITGO merely states that MTI had a contract with Outspoken prior to December 2014 when mGage acquired Outspoken. Moreover, mGage's designated representative testified at his deposition that he did not know when MTI and Outspoken created a business relationship and that he could not explain the nature of Outspoken's business relationship with MTI prior to the acquisition.

15

> Illinois. But it is well established that an individual's contract with an out-of-state party doesn't suffice on its own to establish sufficient minimum contacts in the other party's home forum. *See Burger King*, 471 U.S. at 478. And the nature of the particular contractual relationship here belies the idea that Greving had sufficient contacts with Illinois to support personal jurisdiction in that state.

*See id.*; *see also University Accounting*, 2017 WL 4877418, at *3-4 (involving a nine-year contractual relationship).

¶37 We conclude that, like the defendant in *Northern Grain Marketing*, the nature of the MTI/mGage relationship here belies the idea that mGage had sufficient contacts with Wisconsin to support personal jurisdiction in this State.

¶38 mGage also points to the fact that the contract contains a choice-of-law/forum selection clause providing that the contract would be governed by the laws of Georgia and naming Georgia as the exclusive jurisdiction for "any and all matters arising out of or pertaining to" the MTI contract. CITGO argues that the clause is not relevant because it is a contractual undertaking between the contracting parties and it does not affect the power of a court that is not the selected forum to hear a lawsuit between the parties. CITGO also argues that it is suing mGage in tort, not for breach of contract.

¶39 However, CITGO misses the point of mGage's argument. The choice-of-law/forum selection clause is important when determining whether mGage purposefully invoked the benefits and protections of Wisconsin's laws. mGage asserts that the clause confirms that it would not reasonably foresee being sued in Wisconsin or that the laws of Wisconsin would apply to any disputes. mGage further argues that the clause shows that it did not purposefully avail itself of the privilege of doing business in Wisconsin through the contract.

16

¶40    We agree with mGage that the choice-of-law/forum selection clause is a factor that this court considers in determining whether mGage purposefully invoked the benefits and protections of Wisconsin's laws for jurisdictional purposes. In **Burger King**, the United States Supreme Court noted that "[t]he Court of Appeals reasoned that the choice-of-law provisions are irrelevant to the question of personal jurisdiction." *See id.*, 471 U.S. at 481. The court went on to state that "we believe the Court of Appeals gave insufficient weight to provisions in the various franchise documents providing that all disputes would be governed by Florida law." *See id.* It further explained that "[n]othing in our cases, however, suggests that a choice-of-law *provision s*hould be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes." *See id.* at 482.

¶41    Accordingly we consider the fact that the contract contains the choice of law/forum clause in determining whether mGage purposefully invoked the benefits and protections of Wisconsin laws for jurisdictional purposes. We conclude that the clause reflects that mGage did not invoke the benefits and protections of Wisconsin laws in this case.

¶42    We next address the contemplated future consequences.

### *Contemplated future consequences/parties' actual course of dealings*

¶43    Addressing future consequences and the parties' actual course of dealings, CITGO argues that mGage purposefully availed itself of the benefits and protections of Wisconsin's laws in the following ways: (1) knowingly entering into a contract with a Wisconsin company; (2) requiring MTI to only access mGage's platform using MTI's computers located in Wisconsin; (3) "facilitating" the transmission of thousands of text messages into Wisconsin; and (4) having fourteen

17

mGage employees communicate with MTI in Wisconsin via phone or email while providing support services. CITGO also asserts that mGage's internet related contacts with Wisconsin show that mGage engaged in sufficient targeting of Wisconsin to warrant personal jurisdiction in Wisconsin where the website is accessed. We disagree.

¶44     The contractual language and the manner in which mGage's services were performed under the contract show that mGage's conduct would occur outside of Wisconsin. The MTI contract primarily contemplated that mGage would grant MTI the right to access and use mGage's platform located in California to facilitate and manage MTI's text message program. Under the MTI contract, mGage's involvement with MTI's text messaging programs was limited solely to routing the text messages from MTI to the carriers for delivery to mobile end-users and making any responses sent by those mobile end-users available to MTI. mGage did no more than make its platform accessible to MTI via the internet. MTI used its own computer equipment to access mGage's internet platform and to use the platform to conduct its text messaging programs on behalf of MTI's clients. To be subject to specific personal jurisdiction in Wisconsin, mGage must have "purposefully 'reach[ed] out beyond' [its] State and into [Wisconsin.]" *See **Walden***, 571 U.S. at 285 (citation omitted; first set of brackets in ***Walden***).

¶45     Under the contract, mGage was not involved in the text messaging program that MTI administered for CITGO. mGage did not administer MTI's text message programs for MTI's clients. CITGO or MTI created the text messages and selected which cell phone numbers the text messages would be sent to using mGage's platform in California. MTI, not mGage, sent all the text messages for the CITGO text messaging program. This process is both consistent with what the parties contemplated the future consequences of the contract would be and the

parties' actual course of dealings. MTI created, managed, and sent the text messages for CITGO's text messaging program using mGage's platform located in California. mGage routed the text messages to the carriers for delivery of the text messages to the cell phone users that MTI identified and chose. These activities do not establish that mGage purposefully invoked the benefits and protections of Wisconsin's laws for jurisdictional purposes. Rather, the activities consist of unilateral activities by MTI in choosing how to use and manage mGage's platform located in California. mGage's platform did not reach out to MTI in Wisconsin. Rather, MTI reached out to mGage's platform in California and sent the text messages.

### *Contracting with a Wisconsin company/limited access to the platform*

¶46    Above, we addressed CITGO's arguments regarding knowingly entering into a contract with a Wisconsin company and that the contract required MTI to only access mGage's platform using MTI's computers located in Wisconsin. As we noted, merely entering into a contract with an out-of-state company is not enough to establish personal jurisdiction, and CITGO is wrong in its assertion that the contract requires MTI to access mGage's platform only by using MTI's computers located in Wisconsin.

¶47    We next address CITGO's argument regarding mGage employees communicating with MTI in Wisconsin via phone or email while providing support services.

### *The contractual provisions creating the training and support duties and subsequent performance of those duties*

¶48    CITGO argues that the parties' contemplated future consequences and actual course of dealings included having fourteen mGage employees communicate

with MTI in Wisconsin via phone or email while providing support services. It asserts that

> [r]egardless from where an mGage employee makes such a service call, the act of dialing a Wisconsin phone number to provide support services to a Wisconsin employee, employed by a Wisconsin client, who needs assistance using the mGage platform from a Wisconsin-based computer, is surely an act directed at Wisconsin.

(Emphasis omitted.) CITGO asserts that those activities constitute sufficient minimum contacts with Wisconsin to allow the exercise of personal jurisdiction over mGage by the Wisconsin courts.

¶49 First, in short, CITGO has done no more than to state the proposition without any elaboration. It has not developed or presented an argument telling us why we should accept its conclusory proposition, and it has not referred us to any legal authority supporting the statement. We need not address undeveloped arguments. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Second, CITGO fails to identify the frequency and the nature of the phone calls, emails, and support services. The trial court did not determine the significance of any such contacts and the record before us is devoid of any facts that this court could consider in determining the significance of any such facts on the issue of sufficient minimum contacts for personal jurisdiction. *See Burger King*, 471 U.S. at 475 (stating that the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of … 'attenuated' contacts" (citation omitted)).

¶50 Further, when the issue is whether a forum State may exercise specific jurisdiction over a defendant the suit must "arise out of" or "be related to" the minimum contacts with the forum State. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707,

20

716 (7th Cir. 2002); *GCIU-Emp'r Ret. Fund*, 565 F.3d at 1023. Here, CITGO alleges that mGage was negligent, made negligent misrepresentations, was strictly liable for its misrepresentations, and breached its duty as a subagent because "mGage bungled the CITGO text-messaging campaign." It asserts that mGage's software had a glitch "which meant that text messages were sent to mobile phones (including phones in Wisconsin)" that allegedly failed to ensure compliance with federal law.

¶51    CITGO does not assert that mGage's employees' phone calls or emails relating to support services had anything to do with mGage's alleged act or omission—that mGage's platform did not perform the double opt-in protocol. Therefore, CITGO's claims neither arise out of nor are they related to any phone calls or emails relating to support service provided by mGage. *See Hy Cite Corp. v Badbusinessbureau.com, L.L.C.*, 297 F. Supp. 2d 1154, 1164 (W.D. Wis. 2004) (stating that "the action must *directly arise* out of the specific contacts between defendant and the forum State" (citations omitted)). Here, there is no evidence that this lawsuit arises out of any contacts with Wisconsin connected to the support service phone calls and emails. We conclude that those contacts do not support the exercise of specific personal jurisdiction over mGage in this case. *See Advanced Tactical*, 751 F.3d at 801 ("Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state.").

### *mGage did not target Wisconsin with any activities*

¶52    CITGO asserts that, when assessing the constitutional permissibility of internet related contacts for specific personal jurisdiction, courts pay particular attention to whether a defendant's online resources are accessible to the world at large. It further argues that the courts have observed that when a website's access

is limited by geography or credentials, the website is more likely to have engaged in sufficient targeting to warrant personal jurisdiction in the state where the website is accessed.

¶53   However, the two cases CITGO cites do not stand for a general proposition that where a defendant's website is not accessible worldwide, the defendant is subject to personal jurisdiction in a forum state from which the defendant's website is accessed.  Here, that would be MTI accessing mGage's platform from Wisconsin.

¶54   Although *Advanced Tactical*, cited by CITGO in support of its argument, referenced the role of "targeting" in determining whether exercising personal jurisdiction over an out-of-state corporation is appropriate, the court explained,

> [o]ur inquiry boils down to this:  has [the defendant] purposefully exploited the [forum State] market beyond simply operating an interactive website accessible in the forum state and sending emails to people who may happen to live there? Has the defendant in brief, targeted [the forum state] somehow?
>
> The fact that [the defendant] maintains an email list to allow it to shower past customers and other subscribers with company-related emails does not show a relation between the company and [the forum State].  Such a relation would be entirely fortuitous, depending wholly on activities of the defendant's control.

*Id.*, 751 F.3d at 802-03 (citations and internal quotation marks omitted; four sets of brackets added).

¶55   Addressing the issue of targeting, the *Advanced Tactical* court stated that if the defendant in some way targeted residents of a specific state by geographically restricted online ads, the outcome might be different.  *Id.* at 803.

The court then explained that "[b]ut in such a case the focus would not be on the users who signed up, but instead on the deliberate actions by the defendant to target or direct itself toward the forum state." *Id.*

¶56 More significantly to this case, the court went on to say,

> The interactivity of a website is also a poor proxy for adequate in-state contacts. We have warned that "[c]ourts should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state, even if that site is 'interactive.'" This makes sense; the operation of an interactive website does not show that the *defendant* has formed a contact with the forum state. And, without the defendant's creating a sufficient connection (or "minimum contacts") with the forum state itself, personal jurisdiction is not proper.
>
> …if having an interactive website were enough in situations like this one, there is no limiting principle—a plaintiff could sue everywhere.… Having an "interactive website" (which hardly rules out anything in 2014) should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible. To hold otherwise would offend "traditional notions of fair play and substantial justice."

*Id.* (citations and some quotation marks omitted). The court concluded that the defendant did not have the necessary minimum contacts with the forum state to support specific jurisdiction.

¶57 CITGO argues that mGage targeted its clients and, by extension, their home states, because mGage's website platform and its servers are only accessible to companies like MTI, with which mGage contracts and because mGage's contract dictates that its platform be accessed via MTI's computers in Wisconsin. However, as stated by the court in *Advanced Tactical*, our inquiry boils down to this—did

mGage purposefully exploit Wisconsin's market beyond simply operating an interactive website accessible in Wisconsin?

¶58    First, CITGO's argument principally relies on its assertion that the contract requires that MTI access mGage's platform by using MTI's computers located in Wisconsin. However, as noted above, the contract does not require that MTI access mGage's platform only using MTI's computers in Wisconsin—MTI can access the platform anywhere that its computers are located. MTI unilaterally located its computers in Wisconsin. As noted earlier, "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson*, 357 U.S. at 253. Further, the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result … of the 'unilateral activity of another party or a third person[.]'" *Burger King*, 471 U.S. at 475 (citations omitted). Therefore, we conclude that CITGO's argument fails on this point.

¶59    Likewise, CITGO's argument that mGage targets Wisconsin because its website is only accessible to its customer also fails. The court in *Advanced Tactical* explained that subjecting a defendant to personal jurisdiction in every state where the defendant's interactive website is accessible would offend traditional notions of fair play and substantial justice. *See id.*, 751 F.3d at 803.

¶60    There is no evidence that mGage purposefully exploited Wisconsin's market beyond simply operating an interactive website accessible in Wisconsin. There is also no evidence that mGage targeted Wisconsin customers or residents, mGage's sole contact with Wisconsin is the contract with MTI. There is no evidence that mGage ever advertised or solicited business in Wisconsin. There is

24

no evidence that mGage approached MTI to solicit business, as opposed to MTI approaching Outlook, mGage's predecessor, to initiate the original contract.

¶61    CITGO relies on MTI's unilateral actions to support its argument that mGage targeted Wisconsin.  It argues that mGage sent thousands of text messages into Wisconsin.  However, in its brief, CITGO states "MTI … used mGage's software and [i]nternet platform to send text messages to thousands of mobile phones that belonged to individuals who attended Wisconsin events or that had Wisconsin area codes."  Thus, CITGO concedes that mGage did not send text messages to Wisconsin for CITGO's text program—CITGO or MTI made that choice.  CITGO cannot use MTI's unilateral decisions and contacts with Wisconsin to establish that mGage had sufficient minimum contacts with Wisconsin to establish personal jurisdiction.  "We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *See **Walden***, 571 U.S. at 284.

¶62    We conclude that there is no evidence that mGage targeted Wisconsin.

***CITGO's allegations of defective text messages sent to Wisconsin***

¶63    CITGO further states that "mGage's servers" sent defective text messages to Wisconsin.  Citing ***Johnson Litho Graphics of Eau Claire, Ltd. v. Sarver***, 2012 WI App 107, ¶31, 344 Wis. 2d 374, 824 N.W.2d 127, it then argues that "[a]dvertising text messages sent from a nonresident to Wisconsin residents are sufficient to satisfy the minimum contacts requirement."

¶64    First, as noted above CITGO concedes that MTI, not mGage, sent the text messages into Wisconsin.  Moreover, CITGO slyly phrases its argument stating

that mGage was "facilitating the transmission of thousands of text messages" and that "mGage's server did send defective text messages" to Wisconsin. However, as noted above, CITGO further states in its brief that "MTI used mGage's servers" to send the text messages. Thus, MTI sent the text messages using mGage's platform located in California.

¶65 With respect to ***Johnson Litho***, the facts are distinguishable from the facts in this case. In that case, Sarver, an Illinois resident, telephoned Johnson Litho, a commercial printing company with its sole office in Eau Claire. *See **id.***, ¶2. Following this contact, Sarver commenced a business relationship with Johnson Litho, using the company as his exclusive source for printed materials. *See **id.*** In the paragraph of ***Johnson Litho*** cited by CITGO, this court stated,

> In summary, we conclude that Sarver engaged in sufficient minimum contacts by soliciting and making numerous contacts with Johnson Litho…. Sarver contacted a company to initiate a business relationship and contemplated performance of multiple contracts in that company's home state. Moreover … Sarver created continuing obligations by placing new purchase orders, with each requiring multiple contacts. For these reasons, we conclude that Sarver did not engage in "random" or "attenuated" contacts resulting from Johnson Litho's unilateral activity, but, to the contrary, solicited a business relationship in which he controlled when to order goods, which orders to approve, where to direct shipments, and how to make payments. By voluntarily assuming these interstate obligations involving Wisconsin activities, Sarver established sufficient minimum contacts in Wisconsin[.]

*Id.*, ¶31.

¶66 Here, we do not know whether MTI reached out to Outlook to create the initial contract between those parties, and there are no facts in the record regarding how the first contract between MTI and mGage was initiated. In this case, there is a single contract whereby mGage granted MTI access to its platform in

California. mGage did not create new obligations like the new orders created in *Johnson Litho*. Unlike Sarver in *Johnson Litho*, mGage did not control when text messages would be sent or to whom text messages would be sent. It did not approve any orders for text messages made by MTI's clients. Here, MTI unilaterally made all of those decisions—who its clients would be, the content of the text messages, how the text messages would be managed, and, most significantly, where and to whom the text messages would be sent.

¶67 While some minor aspects of mGage's contractual duties touch upon Wisconsin, the principal reason that Wisconsin is involved in this lawsuit is because MTI is located in this State. CITGO is a Delaware corporation with its principal place of business in Texas. CITGO has sued mGage in Wisconsin seeking to recover monies that CITGO paid to settle a federal class action lawsuit brought by a Florida plaintiff who sued CITGO in Florida. No Wisconsin resident claims injury in this case. Neither the Wisconsin recipients of alleged unwanted text messages, nor MTI, the Wisconsin limited liability company with whom mGage entered into a contract, claim injury. Nonresident CITGO is claiming injury and is seeking contribution from mGage for settlement monies that it paid in the Florida class action. This is not a viable basis upon which to hale mGage, a Delaware limited liability company with its principal place of business in Georgia, into Wisconsin's courts.

## CONCLUSION

¶68 For the reasons stated above, this court concludes that CITGO has not met its burden to show that mGage has the necessary minimum contacts with Wisconsin to support specific jurisdiction. Thus, we reverse the trial court's order

and remand with directions to grant mGage's motion to dismiss the complaint for lack of personal jurisdiction.

     *By the Court*.—Order reversed and cause remanded with directions.